M.I.G. INVESTMENTS, INC., *et al.*, Appellants, v. THE ENVIRONMENTAL PROTECTION AGENCY *et al.*, Appellees.

Second District   No. 2—85—0734

Opinion filed October 15, 1986.—Rehearing denied February 3, 1987.

Lee K. Zelle and Thomas J. Immel, both of Immel, Zelle, Ogren & Mc-Clain, of Springfield, for appellants.

Neil F. Hartigan, Attorney General, of Springfield (Gerald T. Karr, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE HOPF delivered the opinion of the court:

This is an appeal from a decision of the Pollution Control Board (PCB or Board) pursuant to section 41(a) of the Environmental Protection Act (the Act) (Ill. Rev. Stat. 1983, ch. 111½, par. 1041(a)), which provides that review of Board decisions shall be afforded directly in the appellate court. Petitioners, M.I.G. Investments, Inc., and United Bank of Illinois, seek review of a PCB affirmance of an Environmental Protection Agency (EPA or Agency) action which denied petitioners' application for a supplemental development permit. On appeal petitioners assert that the PCB misinterpreted the statutory definition of a new regional pollution control facility.

Petitioners own and operate a solid-waste disposal site, known as Bonus Landfill, in the city of Belvidere in Boone County. The facility has been operating since 1972 under a permit granted by the Agency. The permit allows the facility to accept and dispose of residential, commercial, and industrial wastes, but not hazardous wastes. According to the 1972 permit documents, the site occupies a triangular parcel of land measuring approximately 1,900 feet by 1,300 feet. The maximum elevation shown for the site is 827 feet above sea level.

In January 1985 petitioners submitted an application to the Agency for a supplemental permit to modify development at Bonus Landfill. Petitioners sought to alter the final contouring of the landfill to increase its maximum elevation to 872 feet above sea level. On their application, petitioners stated that the site was running danger-

ously low in capacity and that a proposed lateral extension of the surface area of the existing landfill had been filed with Boone County. They also indicated that the height extension sought from the Agency was compatible with the areal extension proposed to the county. Petitioners set forth several reasons why the space increase they were seeking was needed and noted that the site, which had been in use since 1969, was being encroached by businesses on adjacent property.

On March 26, 1985, petitioners' application was denied. The Agency offered six specific reasons for the permit denial. Petitioners filed a permit appeal to the PCB. Subsequently, the parties entered into a stipulation that all except one issue had been resolved. That issue arose from the following reason given by the Agency as one basis for denial of petitioners' permit application: "Based upon the May 9, 1984 decision of the Circuit court of Lake County Illinois in the case titled *Village of Antioch v. Richard Carlson, Director of Illinois Environmental Protection Agency, and Waste Management of Illinois, Inc.*, No. 83—CH—454, local siting pursuant to Section 39.2 of the Act is required for an increase in disposal capacity due either to new or different elevations above ground or trenches below ground." In Antioch, the trial court had held that the Environmental Protection Act required local approval of a proposed vertical extension of an existing landfill prior to issuance of a permit by the EPA. Petitioners in the instant case had neither sought nor submitted to the Agency local siting approval for their proposed landfill modifications. On the basis of Antioch, the Agency would not grant a permit request without that approval. The parties agreed that the Board could decide the case solely on the remaining issue.

At the Board hearing on this matter the parties' stipulation was admitted into evidence, but no testimony was offered. Only minimal explanations of their respective legal positions were presented by the parties. Subsequent to the hearing, however, both parties briefed the issue. Petitioners argued, among other things, that the Agency had never before interpreted the Act to require local approval for the type of change they were seeking, and that Antioch had no binding precedential value which required the Agency to change its interpretation. The Agency essentially maintained that it had rejected its previous position and adopted the Antioch construction of the statute and urged the Board to follow Antioch also, in the interest of not disturbing a judicially settled legal question.

On August 15, 1985, the PCB issued its opinion and order affirming the Agency's denial of petitioners' permit application by a five to one margin. The dissenting Board member wrote a separate opinion.

Petitioners then filed this appeal.

The parties in this case dispute the proper interpretation of a section of the Environmental Protection Act (Ill. Rev. Stat. 1983, ch. 111½, par. 1001 *et seq.*). Under section 39(c) of the Act, the EPA may not grant a permit for the development or construction of a new regional pollution control facility unless the applicant submits proof that the location of the facility has been approved by the appropriate local government. (Ill. Rev. Stat. 1983, ch. 111½, par. 1039(c).) A new regional pollution control facility is defined, in relevant part, as "the area of expansion beyond the boundary of a currently permitted regional pollution control facility." (Ill. Rev. Stat. 1983, ch. 111½, par. 1003(x)(2).) The PCB opinion contested here held that the "area of expansion beyond the boundary" of an existing facility included vertical extensions of existing landfills, such as the extension sought by petitioners. it is this interpretation of the statutory language that petitioners challenge.

Both the Agency and the PCB based their decisions to require local siting approval, at least in part, on Village of Antioch v. Carlson (May 9, 1984), Lake County circuit court No. 83 CH 454, an unpublished trial court order. The court in Antioch enjoined the EPA from issuing a permit for vertical enlargement of an existing landfill site without following the statutory procedures for a hearing by the officials of the village of Antioch. The court found that the contemplated increase of volume "is a new regional pollution control facility and it was the intent of the legislature to require local siting hearings for such expansion." Village of Antioch v. Carlson (May 9, 1984), Lake County circuit court No. 83 CH 454.

Petitioners argue that the PCB's heavy reliance on Antioch reflects a lack of understanding of the doctrine of *stare decisis*. The Board opinion, however, does not show so much a misunderstanding of *stare decisis* as it shows that the argument for *stare decisis*, if it can be made at all, is very weak.

■ The Board correctly concluded that the Antioch decision was not binding on it since the rendering court was an equal, rather than superior, tribunal. The Act has vested concurrent jurisdiction in the Board and the circuit court to hear enforcement actions. (*People ex rel. Scott v. Janson* (1974), 57 Ill. 2d 451, 312 N.E.2d 620.) It has vested jurisdiction to review Board action in the appellate court rather than the circuit court. (Ill. Rev. Stat. 1983, ch. 111½, par. 1041(a).) Accordingly, the Board and the circuit court are on an equal footing in relation to deciding questions arising from enforcement of the Act. Courts are not bound to follow decisions of equal or inferior

courts. *Village of Northbrook v. Cannon* (1978), 61 Ill. App. 3d 315, 377 N.E.2d 1208.

Even though the Board understood that Antioch had little precedential value, it proceeded to follow the decision anyway. First, however, the Board noted that it did not have before it the complete procedural history of Antioch, and that it had to surmise the facts of the case from the relief granted. In fact, the record shows that all the Board actually had before it was an unpublished, two-page order; an unpublished, one-page order; and an Agency response, with supporting memorandum, to a motion for summary judgment. Neither order gave the reasoning behind the court's decision. The Board opinion points out that the complaint in Antioch was not provided, and that the circuit court orders did not describe the nature of the action. Thus, Antioch provided the Board with neither a factual background nor the reasoning for its holding. Nevertheless, the Board deferred to the Antioch decision to conclude that petitioners' proposed changes required local approval before a permit could issue.

According to the reasoning expressed in its opinion, the Board believed Antioch should be followed in order to avoid creating confusion in a settled area of law. Its conclusion that the area was settled was based on the assertion that the Agency had been implementing the Antioch interpretation for the preceding two years, and that the legislature had taken no steps to alter that interpretation even though it had had time to do so. However, it is undisputed that from the time the statutory provision was enacted until Antioch was decided—a period of some three years—the Agency had espoused a contrary interpretation. In fact, in Antioch itself, the Agency had argued strenuously against the court's ultimate conclusion. Moreover, the record reveals that the Antioch decision was rendered in May 1984. The Board issued its opinion in August 1985. Thus, the Agency could have been applying Antioch for 16 months at most, not two years. Finally, the record is totally devoid of any evidence that the Agency had implemented the Antioch interpretation in so much as a single case prior to the present case. It is equally devoid of any facts showing the likelihood that Antioch had been called to the attention of the legislature. This state of affairs can hardly be described as a settled area of law. The Board's decision that the definition of a new regional pollution control facility encompassed vertical expansions is not supportable on grounds of *stare decisis* based on Antioch.

■■ ■ Since the doctrine of *stare decisis* does not control the interpretation of section 3(x)(2), the court must resort to statutory construction. As in all cases of statutory construction, the court must

strive to determine and give effect to the intent of the legislature in enacting the subject legislation. (*Interlake, Inc. v. Industrial Com.* (1983), 95 Ill. 2d 181, 192, 447 N.E.2d 339.) If the plain language of the statute makes clear the legislative intent, the court need inquire no further. (*Franzese v. Trinko* (1977), 66 Ill. 2d 136, 139, 361 N.E.2d 585; *People v. Mullinex* (1984), 125 Ill. App. 3d 87, 89, 465 N.E.2d 135.) Words used in a statute are to be given their plain and ordinary meaning. (*In re Application of Anderson* (1984), 123 Ill. App. 3d 507, 513, 462 N.E.2d 1006.) Here, section 3(x)(2) includes as a new regional pollution control facility "the area of expansion beyond the boundary of a currently permitted" facility. Petitioners vigorously argue that the terms "area" and "boundary" commonly refer to surface measurements and that if the legislature had wanted to include vertical expansions, they would have spoken of "volume" of expansion beyond permitted "dimensions." We agree with petitioners.

The word "boundary" is most commonly associated with lateral, rather than vertical, limitation. It usually refers to a surface marker, or at least a physical, surface location, which forms a limit of some type. According to the dictionary, a boundary is "something that indicates or fixes a limit or extent: something that marks a bound (as of a territory or a playing field): a bounding or separating line." (Webster's Third New International Dictionary 260 (1981).) Accordingly, the boundary of a "currently permitted" facility is determined by the length and width allowed in the original permit. It is when the landfill wishes to increase its length or width that it can be said to seek expansion beyond its present boundary.

"Area" is also understood, in its most common usage, to refer to surface dimensions. Area is defined as "a definitely bounded piece of ground set aside for a specific use or purpose," or "the superficial contents of any figure: superficial extent: the surface included within any set of lines; ***." (Webster's Third New International Dictionary 115 (1981).) Thus, the "area of expansion" of a landfill is that increased amount of surface that will be taken up by an enlarged facility.

When the concepts of "boundary" and "area" are combined, it is clear to us that the legislature intended to limit local review to that expansion which, while not creating a "new" facility in the usual sense, does come close to that concept. Lateral expansion involves breaking new ground in a previously unused location. In contrast, while vertical expansion increases the capacity of a landfill, it in no way requires the use of more or new surface space. In conclusion, by its plain language, the statutory definition applied only to lateral

growth, which involves a new area outside the landfill's existing boundaries.

Review of other provisions also supports our conclusion. When the legislature provided for local review, it was primarily concerned that local residents be able to have input into the location of proposed solid-waste landfills. Section 39(c) of the Act provides that permits for new regional pollution control facilities may not be granted unless "the *location* of said facility has been approved" (emphasis added) (Ill. Rev. Stat. 1983, ch. 111½, par. 1039(c)) by the appropriate local government. The section also expressly states that a permit does not exempt an applicant from the zoning regulations of the controlling unit of government. The emphasis of the requirements on local review relative to location is compatible with our interpretation of the challenged definition of a new facility.

As pointed out above, lateral expansion means utilizing new surface space, which could result in a landfill being located closer to its neighbors. Use of such a "new" location was intended to be submitted to local review. Increasing the vertical capacity of a landfill does not involve use of any new land and does not alter the geographical relationship of the fill to its neighbors. In summary, although the legislature wanted to provide for review before a landfill was permitted in a local jurisdiction, it intended to limit that review primarily to the propriety of the location of the fill, not its capacity.

While we acknowledge its limitations, the dissenting opinion of the Board member J. Theodore Meyer is entitled to some weight in our analysis. Meyer had been a member of the General Assembly and chairman of the House Energy and Environmental Committee at the time the local-review legislation was enacted. In his dissent Meyer insisted that the legislature understood and intended that the area of expansion beyond the boundary referred only to surface area and not volume. He characterized vertical expansions as technical aspects of design which are beyond the expertise of local government, and peculiarly within the expertise of the Agency. He also disagreed with the Board's decision to surrender jurisdiction over the permitting of vertical expansions on the basis of an unreported decision issued without opinion.

Meyer wrote his dissent from hindsight. The law was enacted in 1981; the dissent was prepared in 1985. Also, Meyer wrote the dissent as a member of the PCB rather than as a legislator. Nevertheless, his insistence that the legislature intended the area of expansion beyond the boundary to refer only to surface area has some persuasive value.

Petitioners urge that the Agency's pre-Antioch interpretation of the statute should be given weight by this court. The record shows that the Agency had probably issued as many as 125 permits for vertical expansion, without local approval, between the effective date of the legislation and the entry of the order in Antioch. Thus, petitioners stress, the Agency did not consider vertical expansion to constitute a new facility at any time prior to Antioch.

While deference is often given to administrative constructions which have been consistently adhered to for a long period of time (*Illinois Consolidated Telephone Co. v. Illinois Commerce Com.* (1983), 95 Ill. 2d 142, 447 N.E.2d 295), in the instant case, the Agency has unmistakably changed its interpretation of section 3(x)(2) (Ill. Rev. Stat. 1983, ch. 111½, par. 1003(x)(2)). In its brief before the PCB the Agency freely acknowledged that it had abandoned its prior position and adopted the rule of Antioch. Despite the rejection of its earlier construction, however, there is no evidence that the Agency has applied the newly adopted interpretation prior to this case. We find ourselves far more inclined to defer to the construction previously and consistently placed on the statute by the Agency, rather than the new meaning now urged upon us.

We are fully aware that the legislature intended, through the Act, to give local governments a voice in landfill decisions which affect them. We find, however, that the role of local entities is not meant to be unlimited. The primary thrust of the pertinent provisions is to ensure a degree of local control over the location of solid-waste disposal facilities. We can find neither statutory language nor indication of relevant legislative intent to persuade us that local control should be extended beyond matters concerning location. Since we are convinced that vertical expansion of a landfill does not raise questions pertinent to location, proposals for such expansion do not trigger the need for local review. Accordingly, we hold that the definition of a new regional pollution control facility set forth in section 3(x)(2) of the Environmental Protection Act (Ill. Rev. Stat. 1983, ch. 111½, par. 1003(x)(2)) does not include vertical extensions to existing landfills.

Pursuant to the views set forth above, the denial of petitioners' application for a supplemental development permit is reversed.

Reversed.

SCHNAKE and STROUSE, JJ., concur.