ILLINOIS BELL TELEPHONE COMPANY, Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.

Fourth District  No. 4—04—0911

Argued September 22, 2005.—Opinion filed December 13, 2005.

Theodore A. Livingston, John E. Muench, and Demetrios G. Metropoulos (argued), all of Mayer, Brown, Rowe & Maw, L.L.P., and John T. Lenahan and Nancy J. Hertel, both of SBC Illinois, both of Chicago, for appellant.

John P. Kelliher (argued), Special Assistant Attorney General, of Chicago, for appellee Illinois Commerce Commission.

Owen E. MacBride, of Schiff Hardin, L.L.P., and William A. Davis II and David J. Chorzempa, both of AT&T Legal Department, both of Chicago, for appellee AT&T Communications of Illinois, Inc.

John W. McCaffrey and Kathleen R. Pasulka-Brown (argued), both of Foley & Lardner, L.L.P., of Chicago, for other appellees.

JUSTICE APPLETON delivered the opinion of the court:

In 2004, in administrative rule-making proceedings, the Illinois Commerce Commission (Commission) adopted a rule entitled "Wholesale Service Quality for Telecommunication Carriers" (83 Ill. Adm. Code pt. 731 (2004), as adopted at 28 Ill. Reg. 12083 (eff. September 1, 2004)). In this new rule, the Commission regulates a type of wholesale telecommunications service called "special access." 83 Ill. Adm. Code § 731.310 (2004), as adopted at 28 Ill. Reg. 12083, 12101-02 (eff. September 1, 2004). Petitioner, Illinois Bell Telephone Company, appeals on two grounds. First, the statute from which the Commission claims to derive its regulatory authority, section 13—712(g) of the Public Utilities Act (Act) (220 ILCS 5/13—712(g) (West 2004)), confers no authority to regulate special access. Second, by classifying telecommunications carriers into four levels (83 Ill. Adm. Code § 731.110 (2004), as adopted at 28 Ill. Reg. 12083, 12095-96 (eff. September 1, 2004)) and regulating only the special access provided by "Level 1 carriers" (83 Ill. Adm. Code § 731.310 (2004), as adopted at 28 Ill. Reg. 12083, 12101-02 (eff. September 1, 2004)), the Commission violates section 13—712(a) of the Act (220 ILCS 5/13—712(a) (West 2004)).

We find section 13—712(g) to be ambiguous on the question of whether the Commission has authority to regulate special access. Because the legislature has charged the Commission with the task of administering and enforcing section 13—712, we defer to the Commission's interpretation of subsection (g), an interpretation we find to be

reasonable. As for petitioner's second contention, the Commission's four-tiered classification of carriers does not offend section 13—712(a). On its face, subsection (a) applies to "basic local exchange service," not special access. 220 ILCS 5/13—712(a) (West 2004). Therefore, we affirm the denial of petitioner's application for rehearing, and we uphold the challenged rule. See 220 ILCS 5/10—201(e)(v) (West 2004).

## I. BACKGROUND

Petitioner is a "local exchange carrier." A "carrier" is a provider of "telecommunications services between points within the State which are specified by the user." 220 ILCS 5/13—202 (West 2004). A "local exchange carrier" provides local, "switched" telephone service. 220 ILCS 5/13—204, 13—206 (West 2004). A "switch" is a computer that routes calls to their destination. An "exchange" is the geographical area—usually a city, town, or village—in which calls are deemed local under the "tariff," or schedule of rates, of the carrier. 220 ILCS 5/13—204, 13—206 (West 2004). (Long-distance or "interexchange telecommunications service" is service between two or more exchanges. 220 ILCS 5/13—205 (West 2004).)

Respondents are the Commission and an alliance of wireless carriers, the Wireless Coalition. From the standpoint of a wireless carrier, wireless telecommunication is not entirely wireless. When someone makes a call on a cellular (cell) phone—whether it be a local, toll, or long-distance call—the wireless carrier receives the signal at a cell site (an antenna mounted on a tall structure such as a tower or building) and then transmits the signal, at high speed, to the wireless carrier's switch. To transmit the signal from its cell site to its switch, the wireless carrier uses special-access circuitry maintained by a local exchange carrier such as petitioner.

Special access differs from basic local exchange service in two ways. First, special access does not pass through the switches of the local exchange carrier; instead, it uses "a dedicated non-switched transmission path" to reach the switch of the wireless carrier. 83 Ill. Adm. Code § 731.105, as adopted at 28 Ill. Reg. 12083, 12095, eff. September 1, 2004 (definition of "wholesale special access"); cf. 220 ILCS 5/13—204 (West 2004) (defining "local exchange telecommunications service" as "switched telecommunications services"). Second (and this distinction is perhaps just another aspect of the first), special access enables telecommunications to travel outside rather than inside the local exchange—or "carrier[ ]to[ ]carrier" as the rule puts it (83 Ill. Adm. Code § 731.105 (2004), as adopted at 28 Ill. Reg. 12083, 12095 (eff. September 1, 2004) (definition of "wholesale special access")). Thus, special access can never be basic local exchange service, the very purpose of special access being to bypass the local exchange.

Although wireless carriers bypass the local exchange, they cannot bypass the local exchange carrier. They depend on the special access that the local exchange carrier provides. To the extent that special access fails, the wireless service fails, resulting in dropped calls, an inability to make or receive calls, and poor call quality.

After workshops with industry stakeholders, evidentiary hearings, and briefing, the Commission found a need to regulate the quality of special access. Several witnesses from wireless carriers testified that local exchange carriers provided poor wholesale special access and thereby impaired their companies' ability to compete. The Commission found these witnesses to be credible.

In Illinois, the Commission found, the vast majority of special access came from three local exchange carriers: petitioner; Verizon North, Inc.; and Verizon South, Inc. (we will call the latter two "Verizon," collectively). The rule divides carriers into four levels on the basis of differing size and characteristics (83 Ill. Adm. Code § 731.110 (2004), as adopted at 28 Ill. Reg. 12083, 12095-96 (eff. September 1, 2004)) and regulates special access provided by "Level 1 carriers," i.e., those with 400,000 or more access lines (83 Ill. Adm. Code § 731.310 (2004), as adopted at 28 Ill. Reg. 12083, 12101-02, eff. September 1, 2004), but not special access provided by the (smaller) carriers in the remaining three levels. Petitioner and Verizon are the only two carriers in Illinois that meet the description of a "Level 1 carrier," and therefore they are the only ones whose special-access services the Commission regulates.

On August 4, 2004, having received a certification of no objection from the Joint Committee on Administrative Rules (JCAR), the Commission adopted the rule over petitioner's objection. Petitioner filed an application for rehearing, arguing, as it did before JCAR, that the Commission lacked jurisdiction to regulate special access. The Commission denied the application on September 22, 2004. This appeal followed. See 220 ILCS 5/10—201(a) (West 2004).

## II. ANALYSIS

### A. Standard of Review

In this appeal, petitioner does not challenge the Commission's factual findings or its evidentiary basis for adopting the rule. Instead, this appeal presents two narrow issues, both of which require nothing more than statutory construction. First, does section 13—712(g) of the Act empower the Commission to regulate special access? Second, does section 13—712(a) allow the Commission to limit its regulation of special access to that provided by "Level 1 carriers"?

■ As a creature of statute, an administrative agency such as the

Commission has only the powers that the statute confers. *People ex rel. Kilquist v. Brown*, 203 Ill. App. 3d 957, 961, 561 N.E.2d 234, 237 (1990). An agency may adopt a rule and regulate an activity only insomuch as a statute empowers the agency to do so. *Popejoy v. Zagel*, 115 Ill. App. 3d 9, 11, 449 N.E.2d 1373, 1374 (1983). An administrative rule unauthorized by statute is invalid, and we must strike it down. *Illinois RSA No. 3, Inc. v. Department of Central Management Services*, 348 Ill. App. 3d 72, 76, 809 N.E.2d 137, 140 (2004); 220 ILCS 5/10—201(e)(iv)(B), (e)(iv)(C) (West 2004).

Because the meaning of a statute is a question of law, we generally construe statutes *de novo. Quad Cities Open, Inc. v. City of Silvis*, 208 Ill. 2d 498, 508, 804 N.E.2d 499, 505 (2004). We say "generally" because if the legislature has charged an agency with administering and enforcing a statute, we "will give substantial weight and deference" to the agency's resolution of any ambiguities in that statute—even if the ambiguity concerns the extent of the agency's jurisdiction under that statute. *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152, 447 N.E.2d 295, 300 (1983). In *Illinois Consolidated Telephone Co.*, 95 Ill. 2d at 145-46, 447 N.E.2d at 296, for instance, the issue was whether the definition of "public utility" in section 10.3(b) of the Act (Ill. Rev. Stat. 1979, ch. 111⅔, par. 10.3(b)) gave the Commission authority to regulate radio paging. On appeal, the Commission interpreted section 10.3(b) to exclude radio paging (*Illinois Consolidated Telephone Co.*, 95 Ill. 2d at 145, 447 N.E.2d at 296), and the supreme court deferred to that interpretation (*Illinois Consolidated Telephone Co.*, 95 Ill. 2d at 152, 447 N.E.2d at 299-300). The court said: "In reaching the judgment that [the radio-paging company] was not a ['public utility'] and was not within the jurisdiction of the Commission, we have considered and given weight to the interpretation the Commission gives to the *** Act." *Illinois Consolidated Telephone Co.*, 95 Ill. 2d at 152, 447 N.E.2d at 299-300. As the court made clear in that case, " 'the general principle of judicial deference to administrative interpretation applies in full strength where such interpretation involves resolution of jurisdictional questions.' " *Illinois Consolidated Telephone Co.*, 95 Ill. 2d at 152-53, 447 N.E.2d at 300, quoting *Pan American World Airways, Inc. v. Civil Aeronautics Board*, 392 F.2d 483, 496 (D.C. Cir. 1968); see also *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 381, 101 L. Ed. 2d 322, 344, 108 S. Ct. 2428, 2444 (1988) (Scalia, J., concurring).

Thus, if reasonable readers of a statute could differ over the extent of the regulatory authority it confers, we defer to the agency's interpretation if the interpretation is defensible. That rule holds true

even if the agency only recently arrived at the interpretation. *Illinois Consolidated Telephone Co.*, 95 Ill. 2d at 154, 447 N.E.2d at 300-01. The longer an agency has adhered to an interpretation of the statute, the more weight the interpretation deserves; but consistency and duration are not prerequisites to our duty of deference. *Illinois Consolidated Telephone Co.*, 95 Ill. 2d at 153-54, 447 N.E.2d at 300.

■ Ambiguity is, however, a prerequisite: the statute must be ambiguous. *Boaden v. Department of Law Enforcement*, 171 Ill. 2d 230, 239, 664 N.E.2d 61, 65 (1996) ("As we find that the statute is not ambiguous, we decline to defer to the [agency's] interpretation"). If the legislative intent is clear, "that is the end of the matter." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 81 L. Ed. 2d 694, 703, 104 S. Ct. 2778, 2781 (1984). But if the statute is ambiguous—if reasonably well-informed persons could understand it in more than one sense (*People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 46, 779 N.E.2d 875, 881 (2002))—"the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, *** the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 81 L. Ed. 2d at 703, 104 S. Ct. at 2782. "A court will not substitute its own construction of a statutory provision for a reasonable interpretation adopted by the agency charged with the statute's administration." *Church v. State*, 164 Ill. 2d 153, 162, 646 N.E.2d 572, 577 (1995), citing *Chevron*, 467 U.S. at 842-45, 81 L. Ed. 2d at 702-04, 104 S. Ct. at 2781-83.

The Commission's interpretation of section 13—712 does not "bind" us in the sense that we must accept it unconditionally, regardless of its reasonableness (see *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 97-98, 606 N.E.2d 1111, 1121-22 (1992)), but if the Commission's interpretation is a permissible one, the fact that we ourselves might have interpreted the statute differently will not justify reversal (*Church*, 164 Ill. 2d at 162, 646 N.E.2d at 577; *Chevron*, 467 U.S. at 843-44, 81 L. Ed. 2d at 703, 104 S. Ct. at 2782).

B. The Scope of "Carrier[-]to[-]Carrier Wholesale Service"
■ Section 13—712 of the Act reads as follows:
"§ 13—712. Basic local exchange service quality; customer credits.
(a) It is the intent of the General Assembly that every telecommunications carrier meet minimum service quality standards in providing basic local exchange service on a non-discriminatory basis to all classes of customers.

(b) Definitions:
\*\*\*

(2) 'Basic local exchange service' means residential and business lines used for [']local exchange telecommunications service['] as defined in [s]ection 13—204 of this Act [(220 ILCS 5/13—204 (West 2004))] \*\*\*.

\* \* \*

(c) The Commission shall promulgate service quality rules for basic local exchange service \*\*\*. \*\*\*

(d) The rules shall, at a minimum, require each telecommunications carrier to do all of the following:

(1) Install basic local exchange service within 5 business days after receipt of an order from the customer \*\*\*. \*\*\* A telecommunications carrier offering basic local exchange service utilizing the network or network elements of another carrier shall install new lines for basic local exchange service within 3 business days after provisioning of the line or lines by the carrier whose network or network elements are being utilized is complete. \*\*\*

(2) Restore basic local exchange service for a customer within 24 hours of receiving notice that a customer is out of service. \*\*\*

(3) Keep all repair and installation appointments for basic local exchange service \*\*\*.

(4) Inform a customer when a repair or installation appointment requires the customer to be present.

(e) The rules shall include provisions for customers to be credited by the telecommunications carrier for violations of basic local exchange service quality standards \*\*\*. \*\*\* At a minimum, the rules shall include the following:

(1) If a carrier fails to repair an out-of-service condition for basic local exchange service within 24 hours, the carrier shall provide a credit to the customer. \*\*\*

(2) If a carrier fails to install basic local exchange service as required under subdivision (d)(1), the carrier shall waive 50% of any installation charges \*\*\*. \*\*\*

(3) If a carrier fails to keep a scheduled repair or installation appointment when a customer premises visit requires a customer to be present, the carrier shall credit the customer $50 per missed appointment. \*\*\*

(4) If a violation of a basic local exchange service quality standard is caused by a carrier other than the carrier providing retail service to the customer, the carrier providing retail service to the customer shall credit the customer as provided in this [s]ection. The carrier causing the violation shall reimburse the carrier providing retail service the amount credited the customer.

When applicable, an interconnection agreement shall govern compensation between the carrier causing the violation, in whole or in part, and the retail carrier providing the credit to the customer.

* * *

(f) The rules shall require each telecommunications carrier to provide to the Commission, on a quarterly basis and in a form suitable for posting on the Commission's website, a public report that includes performance data for basic local exchange service quality of service. ***

(g) The Commission shall establish and implement carrier[-]to[-] carrier wholesale service quality rules and establish remedies to ensure enforcement of the rules." 220 ILCS 5/13—712 (West 2004).

Respondents reason that because special access is a "carrier[-]to[-] carrier wholesale service," section 13—712(g), by its plain terms, empowers the Commission to regulate special access. Petitioner complains that respondents are lifting subsection (g) out of its context. According to petitioner, the title of section 13—712 and the declaration of intent in subsection (a) make clear that by "carrier[-]to[-] carrier wholesale service," the legislature did not mean *all* carrier-to-carrier wholesale service (including special access) but only that used to provide basic local exchange service.

Petitioner offers a reasonable interpretation of section 13—712(g). The heading of section 13—712—"Basic local exchange service; customer credits"—is part of the statute that the General Assembly enacted, and we should give it some consideration when resolving ambiguities in the text. See *Hansen v. Caring Professionals, Inc.*, 286 Ill. App. 3d 797, 805, 676 N.E.2d 1349, 1354 (1997). Interpreting a statute as a whole means interpreting a specific provision in the context of other parts of the statute, including the heading under which the provision appears. *People v. Warren*, 173 Ill. 2d 348, 357, 671 N.E.2d 700, 705 (1996). Special access is, as we have explained, fundamentally different from basic local exchange service and is an important service in the telecommunications industry: the efficient functioning of wireless telecommunications depends on it. Therefore, it could strike one as strange that the legislature would provide for the regulation of special access in a section ostensibly devoted to basic local exchange service.

Arguably, the heading of section 13—712 is indeed a faithful guide to the meaning of subsection (g) because, subsection by subsection, section 13—712 explicitly pertains to basic local exchange service— until we reach subsection (g). In statutes and other forms of discourse, people rely on context to tacitly limit the scope of statements that,

taken in isolation, would be too broad. R. Dickerson, Interpretation & Application of Statutes 200-01 (1975). Even though subsection (g) does not explicitly refer to basic local exchange service, one could reasonably infer that subsection (g) continues the thought in subsections (d)(1) and (e)(4). In those subsections, the statute refers to two carriers: Carrier No. 1, which provides basic local exchange service to retail customers, and Carrier No. 2, which provides wholesale service to Carrier No. 1—*i.e.*, lets Carrier No. 1 use its "network"—so that Carrier No. 1 can in turn provide the basic local exchange service. 220 ILCS 5/13—712(d)(1), (e)(4) (West 2004). The legislature intended that "every telecommunications carrier meet minimum service quality standards in providing *basic local exchange service.*" (Emphasis added.) 220 ILCS 5/13—712(a) (West 2004). In subsections (d)(1) and (e)(4), the legislature recognized that inefficient carrier-to-carrier service on the wholesale level could lead to inefficient basic local exchange service on the retail level and thereby frustrate the legislative intent in subsection (a). One could fairly read subsection (g) with the tacit assumption that the only type of "carrier[-]to[-]carrier wholesale service" the legislature had in mind, in this context, was wholesale service used to provide basic local exchange service—since, after all, basic local exchange service does appear to be what section 13—712 is about.

As respondents argue, however, the problem with so limiting subsection (g) is the limitation has no basis in the language of subsection (g) itself. Contrary to petitioner's repeated assertion in its brief, the legislature did not "expressly limit" subsection (g) to wholesale service used to provide basic local exchange service; rather, petitioner *infers* that limitation from other parts of section 13—712. "If the meaning of any particular phrase or section[,] standing alone[,] is clear[,] no other section or part of the act may be applied to create doubt." 2A N. Singer, Sutherland on Statutory Construction ; 47:02, at 211 (6th ed. 2000). The meaning of subsection (g), standing alone, is crystal-clear. It says: "The Commission shall establish and implement carrier[-]to[-]carrier wholesale service quality rules ***." 220 ILCS 5/13—712(g) (West 2004). Special access is indisputably a carrier-to-carrier wholesale service. Reading a provision in context does not give one a license to disregard the clear language of the provision itself. Statutes are highly deliberative utterances (section 13—712 certainly appears to be, with its definitions, sub-definitions, and exceptions). Thus, we should normally assume that whenever the legislature intended a limitation, it expressed that limitation; conversely, if the limitation is absent from the text, the legislature presumably did not intend the limitation. The utility of statutes depends on the reader's being able to rely on the plain meaning of the text.

Petitioner relies on context, but so do respondents. Subsections (d)(1) and (e)(4) demonstrate that the legislature knew how to use the term "basic local exchange service" in conjunction with a discussion of carrier-to-carrier wholesale service. 220 ILCS 5/13—712(d)(1), (e)(4) (West 2004). The legislature did not use that term in subsection (g)—an omission one could consider to be significant. 220 ILCS 5/13—712(g) (West 2004). "[If] the legislature uses certain words in one instance and different words in another, it intends different results." *Divane v. Smith*, 332 Ill. App. 3d 548, 553, 774 N.E.2d 361, 365 (2002). Unless an improbably absurd construction results, we should be reluctant to second-guess the plain, unqualified language of a statutory provision (*In re D.D.*, 196 Ill. 2d 405, 418-19, 752 N.E.2d 1112, 1120 (2001)), especially if, elsewhere in the statute, the legislature demonstrates an ability to state the qualification (*In re Perona*, 294 Ill. App. 3d 755, 760, 690 N.E.2d 1058, 1062 (1998); *Community Unit School District 200 v. Illinois Insurance Guaranty Fund*, 358 Ill. App. 3d 1056, 1063, 832 N.E.2d 472, 479 (2005)).

We do not find it improbable that the legislature intended the Commission to regulate all "carrier[-]to[-]carrier wholesale service." Arguably, it is improbable that the legislature used that term without realizing what it entailed. The legislature could have decided that while regulating wholesale service used to provide basic local exchange service, the Commission might as well regulate wholesale special access, too, since many consumers use cell phones to make local calls and one of the purposes of article 13 of the Act is to enhance the quality of "telecommunications services" in general (220 ILCS 5/13—103(a) (West 2004)). This is not to equate basic local exchange service with wireless local calls but merely to point out that if the legislature cared about one, it probably was not indifferent to the other. "Statutes must be construed in the most beneficial way which their language will permit so as to prevent hardship or injustice, and to oppose prejudice to public interests." *Mulligan v. Joliet Regional Port District*, 123 Ill. 2d 303, 313, 527 N.E.2d 1264, 1269 (1988).

Although one might have thought that the topic of special access deserved a heading and section of its own, case law warns against putting undue emphasis on such organizational devices. Headings cannot " 'limit the plain meaning of the text.' " *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 505-06, 732 N.E.2d 528, 536 (2000), quoting *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 529, 91 L. Ed. 1646, 1652, 67 S. Ct. 1387, 1392 (1947); see also 73 Am. Jur. 2d *Statutes* § 45 (2001). If a general statutory provision and a specific statutory provision relate to the same subject, the specific provision prevails. *People v. Botruff*, 212 Ill. 2d

166, 175, 817 N.E.2d 463, 468 (2004). "As a rule[,] the words of the heading[,] being more general[,] will not control the more specific words of the act ***." 2A N. Singer, Sutherland on Statutory Construction § 47:14, at 256 (6th ed. 2000).

Not only are headings "mere catchwords" (2A N. Singer, Sutherland on Statutory Construction § 47:14, at 256-57 (6th ed. 2000); see also *Michigan Avenue National Bank*, 191 Ill. 2d at 506, 732 N.E.2d at 536), but as catchwords, they tend not to be rigorously complete summaries of everything in the substantive text (see E. Crawford, Construction of Statutes § 207, at 360 (1940) (noting that headings have a "probability of inaccuracy"). The United States Supreme Court has explained:

> "[H]eadings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis. Where the text is complicated and prolific, headings and titles can do no more than indicate the provisions in a most general manner; to attempt to refer to each specific provision would often be ungainly as well as useless. As a result, matters in the text which deviate from those falling within the general pattern are frequently unreflected in the headings and titles." *Brotherhood of R.R. Trainmen*, 331 U.S. at 528, 91 L. Ed. at 1652, 67 S. Ct. at 1392.

■ In summary, good arguments can be made for and against the opposing interpretations of section 13—712(g) in this case. The parties cite cases interpreting other statutes. Because the statutes in those cases bear little resemblance to the Act, we do not find those cases to be very relevant except for the canons of statutory construction which they invoke and which we have applied to section 13—712. Depending on the canons one chooses and how one deploys them, one could agree with either petitioner or respondents. Our duty, then, is clear: we defer to the Commission's interpretation. See *Church*, 164 Ill. 2d at 162, 646 N.E.2d at 577.

C. Regulation of Only Some Providers of Wholesale Special Access

■ Petitioner contends that by regulating only the special access provided by "Level 1 carriers," the Commission violates section 13—712(a) of the Act. That subsection provides: "It is the intent of the General Assembly that every telecommunications carrier meet minimum service quality standards in providing *basic local exchange service* on a non-discriminatory basis to all classes of customers." (Emphasis added.) 220 ILCS 5/13—712(a) (West 2004). In subsection (a), the General Assembly never declared an intent that every telecommunications carrier meet minimum service quality standards in providing *special access*. Therefore, regulating special access provided only by "Level 1 carriers" does not violate subsection (a).

## III. CONCLUSION

For the foregoing reasons, we affirm the denial of petitioner's application for rehearing, and we uphold part 731 of Title 83 of the Illinois Administrative Code.

Affirmed.

STEIGMANN and McCULLOUGH, JJ., concur.