Filed 3/14/08          NO. 4-07-0682

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE ROCHESTER BUCKHART ACTION GROUP,  ) Appeal from
          Plaintiff-Appellee,         ) Circuit Court of
          v.                           ) Sangamon County
ROBERT YOUNG,                          ) No. 07MR208
          Defendant-Appellant.         )
                                       ) Honorable
                                       ) Leslie J. Graves,
                                       ) Judge Presiding.
_____

          JUSTICE TURNER delivered the opinion of the court:

          In May 2007, plaintiff, Rochester Buckhart Action

Group, filed a motion for preliminary injunction against defen-

dant, Robert Young, to enjoin him from constructing or operating

a hog farm on his property pending the outcome of litigation.  In

May 2007, the trial court granted the preliminary injunction.  In

August 2007, the court denied defendant's motion to vacate.

          On appeal, defendant argues the trial court erred in

failing to vacate the preliminary injunction.  We reverse and

remand.

                         I. BACKGROUND

          Plaintiff is an Illinois general not-for-profit corpor-

ation organized to critically examine and oppose activities that

adversely influence the use and value of property and the quality

of health and the environment in the Rochester and Buckhart areas

of Sangamon and Christian Counties.  Defendant owns property in

Sangamon County and operates a dairy farm, consisting of approxi-

mately 40 dairy cows at any given time.  Defendant had previously

had a hog-confinement building on the property for as many as 2,300 animals, but it was demolished in 2004.

In April 2007, plaintiff filed a three-count complaint against defendant for declaratory judgment (count I), nuisance (count II), and public nuisance (count III). Plaintiff alleged defendant notified the Illinois Department of Agriculture (Department) in February 2006 of his intent to construct a hog finishing operation to house 3,750 hogs at his property. In his notice of intent to construct, defendant stated the proposed facility was an expansion of an existing facility and would not be classified as a "new facility." He proposed to construct a finisher building with a waste-storage structure under the building. He noted the existing structure "has been razed." The facility would be within 1,200 feet of an occupied residence and within 3,700 feet of Buckhart. Defendant admitted the location of the proposed facility would violate setback requirements if he were constructing a "new facility."

In April 2006, the Department informed defendant that the setback requirements had been met. Thereafter, the Department reviewed construction plans and conducted preconstruction site inspections with the understanding defendant's proposal did not meet the definition of a "new facility."

Plaintiff claimed the proposed hog operation would produce "massive volumes of feces, urine, blood[,] and other waste," cause "extremely unpleasant odors," and "attract insects and disease vectors." Plaintiff alleged persons residing and

businesses operating near the facility would be subject to odors and airborne contaminants that present a high probability of injuring their health and welfare and a diminution of property values.

In May 2007, plaintiff filed a motion for preliminary injunction on count I of the complaint citing the Livestock Management Facilities Act (Act) (510 ILCS 77/1 through 999 (West 2006)). Plaintiff stated the Act provided minimum setbacks, stiffer design requirements, and an opportunity for public notice, comment, and hearing when a "new facility" is contemplated. Plaintiff alleged defendant failed to notify the Department of his intent to construct a "new facility" and failed to subsequently file a registration with the Department. Having failed to comply with the Act's provisions, he was not authorized to construct the facility. Plaintiff also alleged that even if defendant was expanding an existing facility, it remained a new facility because he was expanding the number of animal units to be confined on the property. Plaintiff sought a preliminary injunction enjoining defendant from constructing and operating a hog farm pending the outcome of the litigation.

In May 2007, the trial court granted the motion for preliminary injunction. The court found plaintiff had shown "there is a fair question that [p]laintiff will succeed on the merits in claiming [d]efendant is constructing a 'new' livestock[-]management facility as defined in the Act." Further, plaintiff would suffer irreparable harm if an injunction did not

- 3 -

issue and no adequate remedy at law or in equity existed.  The court enjoined defendant from continuing to construct a hog-confinement building on his property pending further order.

In June 2007, defendant answered the complaint, raising as an affirmative defense that he was not constructing a "new" livestock-management facility but expanding an existing facility. In July 2007, defendant filed a motion to vacate the preliminary injunction, stating additional evidence had developed establishing he was expanding an existing facility and the fixed capital costs of the expansion did not exceed 50% of the fixed capital costs of replacing the existing facility with an entirely new one.

Defendant attached the deposition of Warren Goetsch to his motion to vacate.  Goetsch, an agricultural engineer, testified he worked as the Department's bureau chief of environmental programs.  He stated a review of defendant's information and calculations indicated a plan for an expansion of an existing facility.  The Department determined defendant's proposed project came in just below 41% of the fixed capital cost of replacing the entire existing facility, thereby taking the project outside the definition of a "new facility."

Defendant also filed an affidavit stating the entire subject farm property had previously been designated by the Department as a single livestock-management facility.  Further, the property had historically housed "pasture and dairy facilities for dairy cows, both open and closed facilities for raising

hogs, and a hog[-]confinement building for the finishing of hogs, which numbered as high as 2,300 animals."  The hog-confinement building had outlived its useful life and was demolished in 2004 to make way for the construction of a replacement building.  In June 2006, defendant obtained financing for its construction.

In August 2007, the trial court denied defendant's motion to vacate the preliminary injunction.  Defendant then filed a notice of interlocutory appeal pursuant to Supreme Court Rule 307 (188 Ill. 2d R. 307).

## II. ANALYSIS

Defendant argues the trial court erred in declining to vacate the preliminary injunction, thereby enjoining the completion of his hog-confinement building.  We agree.

"The purpose of the preliminary injunction is to preserve the status quo pending a decision on the merits of a cause."  Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Ry. Co., 195 Ill. 2d 356, 365-66, 748 N.E.2d 153, 159 (2001).

> "To establish entitlement to a prelimi-
> nary injunctive relief, the plaintiff must
> demonstrate (1) a clearly ascertainable right
> that needs protection; (2) irreparable harm
> without the protection of an injunction; (3)
> no adequate remedy at law for plaintiff's
> injury; and (4) a substantial likelihood of
> success on the merits in the underlying ac-

tion." Franz v. Calaco Development Corp., 322 Ill. App. 3d 941, 946, 751 N.E.2d 1250, 1255 (2001).

The trial court has the inherent power during the pendency of a case to issue, modify, or vacate a preliminary injunction. Patrick Media Group, Inc. v. City of Chicago, 252 Ill. App. 3d 942, 946, 626 N.E.2d 1062, 1065 (1993). The court has the power "to dissolve a preliminary injunction absent change of facts or law from the time of issuance to the time of dissolution, provided a sufficient basis exists to support dissolution." Patrick, 252 Ill. App. 3d at 946, 626 N.E.2d at 1065. On appeal, a trial court's decision to uphold or dissolve the injunction will be not be reversed absent an abuse of discretion. Patrick, 252 Ill. App. 3d at 946, 626 N.E.2d at 1065.

Here, the trial court found plaintiff had a clearly ascertainable right in need of protection, namely the rights of citizens of Sangamon County and nearby residents to be afforded the protections and procedural rights of the Act; irreparable harm would result if an injunction did not issue; no adequate remedy at law or in equity existed; and plaintiff showed a fair question it would succeed on the merits.

The issue raised in defendant's motion to vacate was whether a fair question existed that plaintiff would succeed on the merits in claiming defendant was constructing a new livestock-management facility as defined in the Act. The Act imposes certain requirements on new facilities. Any new facility

must comply with certain setback requirements (510 ILCS 77/35(c) (West 2006)), have the proposal subjected to public notice and informational meetings (510 ILCS 77/12 (West 2006)), and adhere to construction restrictions and siting prohibitions (510 ILCS 77/13(b) (West 2006)).

The issue of whether defendant's proposal constitutes a new facility or simply the expansion of an existing one depends on the definition of "new facility" as set forth in the Act.

"'New facility' means a livestock[-]management facility or a livestock waste[-]handling facility the construction or expansion of which is commenced on or after the effective date of this Act [May 21, 1996]. Expanding a facility where the fixed capital cost of the new components constructed within a 2-year period does not exceed 50% of the fixed capital cost of a comparable entirely new facility shall not be deemed a new facility as used in this Act." 510 ILCS 77/10.45 (West 2006).

At the time of the lawsuit, defendant's farm property included a dairy-cow operation. A "'[l]ivestock[-]management facility' means any animal feeding operation, livestock shelter, or on-farm milking and accompanying milk-handling area." 510 ILCS 77/10.30 (West 2006). Plaintiff does not argue the dairy-cow operation does not constitute a livestock-management facil-

ity. Instead, plaintiff claims defendant proposed to construct a new facility for the hogs. Defendant's facility had at one time utilized a hog-confinement building and pit with over 2,000 hogs. By 1999, the hog-confinement building had outlived its useful life, and it was demolished in 2004 to make way for a replacement. Defendant proposed construction of the replacement building in 2006.

The evidence before the trial court on the motion to vacate indicates defendant's proposed construction did not constitute a "new" facility. Instead, the facility already existed. Whether considering the dairy-cow operation alone, or together with the dormant hog operation, a livestock-management facility was then operating. This is not a situation where an applicant proposed to build "an entirely new facility," as queried in the Department's application form, and construct that facility from the ground up on a barren piece of land.

Plaintiff argues defendant is proposing a new facility, not simply spreading out his existing dairy operation. However, defendant sought to build a structure to house hogs on top of a waste-storage containment area at the site where a similar structure had been demolished. Moreover, the Act does not differentiate among species in defining new facilities or livestock-management facilities, referring only to "animals" or "livestock." Goetsch, the Department's bureau chief of environmental programs, pointed out the Act is "species neutral." Nowhere in the Act can plaintiff show that introducing, or

reintroducing, as is the case here, a new or different species at a facility constitutes the establishment of a new facility. Further, the Act does not consider the number of animals present or being added to a facility in determining whether a facility is new. Plaintiff's claim that different facilities would result-- that being an animal feeding operation and the other a milking operation--fails to recognize that cows are fed to produce milk. Here, the facility was not new, in terms of infancy, but was the expansion of an existing operation.

An expansion could still be deemed a "new facility" if certain amounts are expended as stated in the Act. "Expanding a facility where the fixed capital cost of the new components constructed within a 2-year period does not exceed 50% of the fixed capital cost of a comparable entirely new facility shall not be deemed a new facility as used in this Act." 510 ILCS 77/10.45 (West 2006).

In the case sub judice, Goetsch found a review of defendant's application indicated a plan for the expansion of an existing facility. Based on defendant's cost projections, the proposed project came in slightly below 41% of the fixed capital cost of replacing the entire existing facility. Thus, the expansion project did not meet the definition of "new facility" since the costs did not exceed 50% of the cost of a comparable entirely new facility.

We note the General Assembly found the current trend in the livestock industry was "for larger concentration of animals

at a livestock[-]management facility due to various market forces." 510 ILCS 77/5(a)(4) (West 2006). With an increasing number of animals comes the "potential for greater impacts on the immediate area." 510 ILCS 77/5(a)(6) (West 2006). "[T]he purpose of the Act is twofold: to promote the livestock industry and to make sure that the livestock industry is a good neighbor to nearby residents." Nickels v. Burnett, 343 Ill. App. 3d 654, 660, 798 N.E.2d 817, 823-24 (2003); see also 510 ILCS 77/5(b) (West 2006). Although plaintiff no doubt has valid concerns about the arrival of 3,750 hogs in the neighborhood, the facts in this case do not establish the construction of a new facility as defined by the Act. In arguing a new facility was being con-structed, plaintiff's contentions regarding the different species involved here and the increased number of animals on-site are not covered in the Act and are matters better suited for the General Assembly in determining the restrictions and requirements for the construction of new facilities and the expansion of existing ones. As defendant's proposal does not show the construction of a new facility, the trial court erred in denying the motion to vacate. Accordingly, the preliminary injunction must be dis-solved. We make no determination as to the merits of any current or future issues before the trial court.

### III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

Reversed and remanded.

- 10 -

APPLETON, P.J., concurs.

COOK, J., dissents.

JUSTICE COOK, dissenting:

I respectfully dissent and would affirm the trial court's decision.

A motion to vacate a preliminary injunction, which the majority wishes to allow, requires a defendant to prove that the plaintiff presents no "fair question" as to the legal rights involved. People ex rel. Stoney Island Church of Christ v. Mannings, 156 Ill. App. 3d 356, 362, 509 N.E.2d 572, 576 (1987). Defendant has not met this standard.

The majority's order turns on Department manager Goetsch's deposition and attached Department documentation, submitted subsequent to the trial court's granting of the injunction, indicating that defendant's proposed construction is not a "new" facility. The Act defines a "new" facility as follows:

> "[A] livestock[-]management facility or a live-stock waste[-]handling facility the construction or expansion of which is commenced on or after the effective date of this Act. Expanding a facility where the fixed capital cost of the new components constructed within a 2-year period does not exceed 50% of the fixed capital cost of a comparable entirely new facility shall not be deemed a new facility as used in this Act."
> 510 ILCS 77/10.45 (West 2006).

Goetsch stated in his deposition that defendant's project consti-

- 12 -

tuted an "expansion," the cost of which was only 41% of the cost to complete an entirely new structure.

The notice and processing requirements differ greatly depending on whether the proposed construction qualifies as a "new" facility. Section 11(a) and section 12 of the Act control the notice and processing requirements for an owner's application to construct a "new" facility serving 1,000 or more animal units (or a facility that utilizes a lagoon). 510 ILCS 77/11(a), 12 (West 2006). One thousand animal units equals about 714 milking dairy cows or 2,500 swine weighing over 55 pounds. 510 ILCS 77/10.10 (West 2006). Under section 11(a), the owner of any proposed facility, regardless of whether it is "new," must file a notice of intent to construct with the Department and include information regarding setback requirements (for a "new" facility) or maximum feasible location requirements (for a facility that is not "new"). 510 ILCS 77/11(a) (West 2006). Then, under section 12, the Department sends a copy of the notice form that was filed under section 11(a) to the local county board, which will in turn publish notice of the proposed new facility, essentially inviting public comment during a 30-day review period. 510 ILCS 77/12(a) (West 2006). The county board, or 75 county residents, may request that the Department hold an informational hearing where the owner attends and answers questions. 510 ILCS 77/12(a) (West 2006). The county board then submits a nonbinding recommendation to the Department containing a statement as to whether the proposed facility achieves the eight siting criteria outlined in

- 13 -

subsection 12(d).  510 ILCS 77/12(d) (West 2006).  Among the most relevant siting criteria are whether (1) the design, location, and proposed operation will protect the environment by being consistent with this Act; (2) the facility is located within a 100-year floodplain or otherwise environmentally sensitive area and the construction plans are consistent with the goal of protecting the safety of the area; (3) the owner has submitted plans for operation that minimize the likelihood of any environmental damage to the surrounding area from spills, runoff, and leaching; (4) the construction or modification of a new facility is consistent with existing or projected community growth as they pertain to applicable zoning and setback requirements for populated areas as defined by this Act; (5) the location minimizes any incompatibility with the surrounding area's character; and (6) odor control plans are reasonable.  See 510 ILCS 77/12(d) (West 2006).

In our case, the Department followed section 11(b) in processing defendant's application to construct, rather than section 12, because the Department was operating under the assumption that defendant's project was not a "new" facility. Section 11(b) applies to proposed construction projects that are not subject to section 12 (i.e., they are not "new" and they do not utilize a lagoon).  The section 11(b) requirements are less strenuous than those in section 12; they require only that the construction plans and design specifications of the proposed structure be filed with the Department within 10 calendar days of

- 14 -

the anticipated dates of construction and that the Department review the documents to determine if all information has been submitted or if clarification is needed. 510 ILCS 77/11(b) (West 2006). The Department then has 15 calendar days within receipt of the owner's notice to notify the owner that construction may begin or that clarification is needed. 510 ILCS 77/11(b) (West 2006).

In addition to the more strenuous notice and processing requirements placed on "new" facilities as described in section 12, "new" facilities also are subject to additional setback (510 ILCS 77/35(c) (West 2006)) and design requirements concerning flood protection and other environmentally sensitive areas (510 ILCS 77/13(b) (West 2006)). Another way of looking at the question posed by the plaintiff here is not necessarily whether defendant's project constitutes a "new" facility, but whether it is the sort of project that legislature intended to be subjected to more strenuous notice, processing, and setback requirements as described above.

We find M.I.G. Investments, Inc. v. Environmental Protection Agency, 122 Ill. 2d 392, 523 N.E.2d 1 (1988), to be instructive. In M.I.G., the owner of a waste-disposal landfill sought a permit to increase the landfill's maximum elevation. The owner argued that the vertical expansion of an existing pollution-control facility did not constitute a "new" facility under section 3(x)(2). M.I.G., 122 Ill. 2d at 395-96, 523 N.E.2d at 2, citing Ill. Rev. Stat. 1985, ch. 111 1/2, par. 1003(x)(2).

Section 3(x)(2) defined a "'new regional pollution[-]control facility'" as "'the area of expansion beyond the boundary of a currently permitted regional pollution[-]control facility.'" M.I.G., 122 Ill. 2d at 395, 523 N.E.2d at 2, quoting Ill. Rev. Stat. 1985, ch. 111 1/2, par. 1003(x)(2).  Traditionally "expansions" and "boundaries" under section 3(x)(2) had been assumed to be horizontal, not vertical.  M.I.G., 122 Ill. 2d at 396, 523 N.E.2d at 2; see also M.I.G. Investments, Inc. v. Environmental Protection Agency, 151 Ill. App. 3d 488, 495, 502 N.E.2d 1042, 1046 (1987) (as many as 125 permits had been issued by the agency for vertical expansion without triggering the more strenuous review process that accompanied "expansions" under 3(x)(2)).  If the vertical expansion did not qualify the landfill as a "new" facility, the proposed project would not trigger new siting and hearing requirements under the Illinois Environmental Protection Act (Environmental Act) (415 ILCS 5/1 through 58.7 (West 2006)).  Criteria set forth in section 39.2 of the Environmental Act, among other things, required that (1) the waste facility be designed and operated so as to protect the public health and safety; (2) be located so as to minimize incompatibility with the character of the surrounding area; (3) be located outside the boundary of the 100-year flood plain or that the site be flood-proofed; (4) the plan of operations be designed to minimize danger to the surrounding area in terms of fire, spills, or other operational accidents; and (5) traffic plans be designed to minimize the impact on existing traffic flows.  M.I.G., 122 Ill.

- 16 -

2d at 398-99, 523 N.E.2d at 4, citing Ill. Rev. Stat. 1985, ch. 111 1/2, par. 1039.2(a). The court held that although expansion of a facility had historically been determined by lateral limitations, vertical expansion should also trigger the "new pollution[-]control facility" siting and hearing requirements. M.I.G., 122 Ill. 2d at 399-400, 523 N.E.2d at 4. The court reasoned:

> "To expand the boundaries of a landfill, whether vertically or laterally, in effect, increases its capacity to accept and dispose of waste. An increase in the amount of waste contained in a facility will surely have an impact on the criteria set out in section 39.2(a), which local governmental authorities are to consider in assessing the propriety of establishing a new pollution[-]control facility. Indeed, adjusting the dimensions of a landfill facility to increase the amount of waste stored will surely have an impact on 'the danger to the surrounding area from fire, spills, or other operational accidents' and 'the character of the surrounding area.' [Citation.]" M.I.G., 122 Ill. 2d at 401, 523 N.E.2d at 5.

Allowing defendant's proposed project to bypass all the notice, processing, and siting requirements set in place by

- 17 -

sections 12, 35(c), and 13(b) would be inconsistent with the purposes of the Environmental Act. The Illinois Pollution Control Board set forth some of the first regulations concerning the health and safety impacts of livestock-management facilities in 1978. See 35 Ill. Adm. Code §501.102(e) (filed and eff. January 1, 1978). The purpose of these regulations was to prevent air and water pollution caused by a failure to plan with regard to proper environmental safeguards concerning the con-struction, location, and operation of certain livestock facili-ties. 35 Ill. Adm. Code §501.102(e), as amended at 15 Ill. Reg. 10075, 10082 (eff. July 1, 1991). There is a danger that, without adequate environmental planning and safeguards, livestock-management facilities could cause air pollution, render waters harmful to public health, and even compromise the health and safety of the animals housed therein. 35 Ill. Adm. Code §501.102(c), as amended at 15 Ill. Reg. 10075, 10081 (eff. July 1, 1991).

Later, in 1996, the Illinois legislature enacted the Act with the purpose of "maintain[ing] an economically viable livestock industry in the State of Illinois while protecting the environment for the benefit of both the livestock producer and persons who live in the vicinity of a livestock[-]production facility." 510 ILCS 77/5(b) (West 2006). The Act endorsed existing regulations concerning the management of livestock production, yet felt some enhancements were needed. 510 ILCS 77/5(a)(1), (a)(5) (West 2006). The legislature noted that, due

to market forces, the trend has been for livestock-management facilities to house larger concentrations of animals. 510 ILCS 77/5(a)(4) (West 2006). With more animals comes a greater threat of adverse impacts to the environment, and precautions must be taken so that waste-elimination mechanisms do not compromise the groundwater in the area or create odors that are offensive to neighbors. 510 ILCS 77/5(a)(6),(a)(7), (a)(8) (West 2006).

Here, defendant is increasing the number of animals housed in his facility from 56 animal units (40 milking dairy cows equals 56 animal units) to 1,500 animal units (3,750 swine equals 1,500 animal units). 510 ILCS 77/10.10 (West 2006). Given that the legislature was mindful of the tendency toward increased concentration of animal units and the resulting harm to the environment when it enacted the Act, it seems unreasonable that defendant could change the nature and character of his operation from a de minimus operation housing only 56 animal units to a very large operation housing 1,500 animal units without engaging in any of the notice, processing, and siting requirements set forth in section 12. Although section 10.45 of the statute defining "new" facilities does not contemplate the number of animal units as a factor, section 12, which governs whether a more strenuous evaluation process applies, does. Again, section 12 applies to new facilities that contain more than 1,000 animal units. The introduction of a high concentration of animal units where no such concentration previously existed surely impacts the requirements set out in section 12(d)

- 19 -

and as described above.  See M.I.G., 122 Ill. 2d at 401, 523 N.E.2d at 5 (implying that whether a change to a facility impacts the siting and hearing requirements is a factor in determining whether that change should trigger them).  Here, introducing a high concentration of animals to the area would surely impact the section 12(d) requirements of "minimiz[ing] the likelihood of any environmental damage to the surrounding area from spills, runoff, and leaching," and "[reasonable] odor control plans."  510 ILCS 77/12(d)(5), (d)(6) (West 2006).

Perhaps the legislature did mean to grandfather in preexisting structures containing 1,000 animal units in the sense that any proposed moderate expansion on such structures would not be subject to the strenuous section 12 evaluation process.  However, the facility at issue in this case is not a preexisting structure housing 1,000 animal units.  At the most, it is just a (virtually nonoperating) preexisting structure.  The fact that property was used many years ago to house large numbers of animals does not mean the owner gets a "free pass," that every future project will now be labeled just an "expansion."

However, it is not even certain that defendant's project constitutes the "expansion" of a preexisting structure rather than the "construction" of a structure.  The words "con-struction" and "expansion" are not defined by the Act.  If the proposed changes do not constitute an "expansion" under the statute, then the fact that the project costs less than 50% of the cost to build an entirely new structure is irrelevant, taking

- 20 -

away the majority's basis for reversing the trial court. The existing housing structure has been <u>completely</u> <u>razed</u>. Defendant is not just adding 50% to what is already there. Is there not a "fair question" that defendant's project should constitute a "construction" under these circumstances? We can only guess why the proposed building cost is only 41% of building an entirely new structure if the old structure has been razed; perhaps it is because defendant proposes to build in the footprint of the old structure, or perhaps it is because adjoining storage or equipment buildings on the property remain.

The only reason defendant offers to support the notion that this court should consider his project an "expansion" costing 41% of the cost of building the same structure from scratch is that Department manager Goetsch labeled it as such. Defendant argues that this "finding of fact" on the part of Goetsch is entitled to deference. See <u>XL Disposal Corp. v. Zehnder</u>, 304 Ill. App. 3d 202, 207, 709 N.E.2d 293, 297 (1999) (court should give deference to administrative agency's determination of fact). However, this level of deference, as noted in <u>XL Disposal</u> and other cases cited by defendant, applies to administrative-review cases, where the court reviews findings of fact as determined by an administrative law judge at an administrative hearing, not findings of fact as determined by an employee of an administrative agency. See 5 ILCS 100/10-5 through 10-70 (West 2006) (Illinois Administrative Procedure Act regarding rules for contested-case proceedings). Under the Illinois

Administrative Procedure Act, an administrative agency is required to make findings of fact as condition precedent to an order, which must be specific enough to enable courts of review to intelligently review the decision of the agency. Allied Delivery System, Inc. v. Illinois Commerce Comm'n, 93 Ill. App. 3d 656, 664-65, 417 N.E.2d 777, 783 (1981); 5 ILCS 100/10-50 (West 2006) (governing administrative decisions and orders). Here, no such order containing said findings of fact has been made for us to review.

Finally, defendant argues that even if the Act is ambiguous as to what types of construction and/or expansion projects are subject to the more strenuous section 12 notice and processing requirements, this court should give deference to the Department's determination that defendant's project is not subject to section 12, 35(c), and 13(b) requirements. An administrative agency's interpretation of a statute it is charged with administering does not "bind" a court of review in the sense that a court of review must accept it unconditionally regardless of its reasonableness; however, if the agency's interpretation is a permissible one, the fact that we ourselves may have interpreted the statute differently does not justify reversal. Illinois Bell Telephone Co. v. Illinois Commerce Comm'n, 362 Ill. App. 3d 652, 657, 840 N.E.2d 704, 709-10 (2005). "The longer an agency has adhered to an interpretation of the statute, the more weight the interpretation deserves; but consistency and duration are not prerequisites to our duty of deference." Illinois Bell, 362 Ill.

- 22 -

App. 3d at 657, 840 N.E.2d at 709.  Here, Goetsch conceded that bringing in a very large number of animals to a facility or property that most recently housed only a much smaller number of a different animal species was an unusual request that the Department had not dealt with often.  Under these circumstances, and with strong emphasis on the purposes of the Act, I believe a fair question exists as to whether defendant's project should satisfy the Act's notice, processing, and siting requirements imposed on new facilities.